UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, U.S. Attorney's Office 601 D Street, NW Washington, DC 20530 <br><br> Plaintiff, <br><br> v. <br><br> LAURA G. ROSS, 401 Ninth Street, NW Washington, DC 20004, <br><br> THOMAS E. ROTHMAN, 401 Ninth Street, NW Washington, DC 20004, <br><br> - and - <br><br> DIANE KAPLAN, 401 Ninth Street, NW Washington, DC 20004, <br><br> Defendants. | Civil Action No. 25-2261 |

## **COMPLAINT**

The United States of America (the "United States"), by and through undersigned counsel, brings this complaint and alleges as follows.

1.      Since April 28, 2025, Defendants Laura G. Ross, Thomas E. Rothman, and Diane Kaplan have been usurping and purporting to exercise unlawfully the office of board member of the Corporation for Public Broadcasting (the "CPB").  The United States now brings this quo warranto action to oust them from that office.

2.      President Donald J. Trump lawfully removed each Defendant from office on April 28, 2025.  As recent Supreme Court orders have recognized, the President cannot meaningfully

exercise his executive power under Article II of the Constitution without the power to select—and, when necessary, remove—those who hold federal office.  Personnel is policy, after all.

3.      In this instance, Defendants immediately sued the President and others in this Court and sought a preliminary injunction that would have enjoined the government from giving effect to their removal, *see* Compl., *Corp. for Pub. Broad. v. Trump*, Civ. A. No. 25-1305 (RDM) (D.D.C. Apr. 29, 2025) ("*CPB v. Trump*"), ECF No. 1; Mot. for TRO, *CPB v. Trump*, ECF No. 2.  But the Court properly denied that motion, holding among other things that Defendants here (i.e., plaintiffs in *CPB v. Trump*) were not likely to succeed in their claim that the President lacked the authority to remove them.  Mem. Op. & Order at 13-21, *CPB v. Trump*, ECF No. 32.

4.      Despite the Court's denial of their request for preliminary relief, Defendants have continued to usurp the office of board member of the CPB, including by participating in board meetings, voting on resolutions and other business that comes before the board, and presenting themselves to the public as board members.  All of this is manifestly unlawful.

5.      In short, Defendants are defiantly acting as if the Court granted the relief the Court denied—raising the question of why they bothered to seek preliminary relief and consume the resources of the Court and the parties if they were simply going to ignore any adverse ruling.

6.      The United States cannot just stand by when lawful orders—both executive and judicial—are so openly flouted.  The writ of quo warranto, codified by statute in the District of Columbia, provides a remedy against Defendants' usurpation.  Accordingly, the United States, through the United States Attorney, brings this action for quo warranto to oust and exclude Defendants from their usurped offices, and for appropriate related relief.

**JURISDICTION AND VENUE**

7.      This Court has jurisdiction over this action under 28 U.S.C. § 1331, 28 U.S.C. § 1345, and D.C. Code § 16-3501.

8.      Venue is proper in this judicial district under D.C. Code § 16-3501 and 28 U.S.C. § 1391(b), because a substantial part of the events giving rise to the claim occurred in the District of Columbia.

## PARTIES

9.      Plaintiff is the federal government of the United States of America.  Pursuant to D.C. Code § 16-3501 and § 16-3502, the Attorney General of the United States or the United States Attorney may institute a quo warranto proceeding for the United States against a person who within the District of Columbia usurps, intrudes into, or unlawfully holds or exercises a public office of the United States.

10.      Defendant Laura G. Ross was a member of the Board of Directors of the CPB until the President removed her from that office on April 28, 2025.  She is continuing to usurp that office.  The CPB is a District of Columbia corporation with its corporate address at 401 Ninth Street, NW, Washington, DC.  Accordingly, the office that Ross has usurped and intruded into is located within the District of Columbia.

11.      Defendant Thomas E. Rothman was a member of the Board of Directors of the CPB until the President removed him from that office on April 28, 2025.  He is continuing to usurp that office.  The CPB is a District of Columbia corporation with its corporate address at 401 Ninth Street, NW, Washington, DC.  Accordingly, the office that Rothman has usurped and intruded into is located within the District of Columbia.

12.      Defendant Diane Kaplan was a member of the Board of Directors of the CPB until the President removed her from that office on April 28, 2025.  She is continuing to usurp that office.  The CPB is a District of Columbia corporation with its corporate address at 401 Ninth Street, NW, Washington, DC.  Accordingly, the office that Kaplan has usurped and intruded into is located within the District of Columbia.

**NATURE OF THE CASE**

**I.     The Corporation for Public Broadcasting**

13.     The CPB is a corporation created by Congress that advances governmental purposes subject to statutory restrictions by deploying appropriated taxpayer dollars.  The CPB is overseen by a board consisting solely of Senate-confirmed Presidential appointees.

14.     Congress created the CPB in the Public Broadcasting Act of 1967 (the "Act").  Pub. L. No. 90-129, 81 Stat. 365, *codified at* 47 U.S.C. § 390–399b.  Congress determined that the CPB would advance various governmental purposes, including serving the "public interest" by "encourag[ing] the growth and development of public radio and television broadcasting" and "nonbroadcast telecommunications technologies for the delivery of public telecommunications services."  47 U.S.C. § 396(a)(1), (2); *see also*, *e.g.*, *id.* § 396(a)(4) ("the encouragement and support of public telecommunications . . . are . . . of appropriate and important concern to the Federal Government"); *id.* § 396(a)(9) ("it is in the public interest for the Federal Government to ensure that all citizens of the United States have access to public telecommunications services through all appropriate available telecommunications distribution technologies").  The CPB advances these purposes primarily by using appropriated taxpayer funds, drawn from an established Public Broadcasting Fund administered by the Secretary of the Treasury, to issue grants supporting public broadcasting, in a manner prescribed in detail by statute.  *See id.* § 396(k).

15.     The CPB is governed by a "Board of Directors," which, when fully staffed, "consist[s] of 9 members appointed by the President, by and with the advice and consent of the Senate."  *Id.* § 396(c)(1).  The Act provides that "[t]he term of office of each member of the Board appointed by the President shall be 6 years."  *Id.* § 396(c)(5).  The Act contains no explicit provision protecting board members from removal, such as a for-cause removal restriction.  The only provision explicitly discussing how board members could lose their seats during their term

states that board members who fail to attend fifty percent of board meetings in a calendar year "shall forfeit membership and the President shall appoint a new member to fill such vacancy not later than 30 days after such vacancy is determined by the Chairman of the Board." *Id.* § 396(c)(7).

16.     The statute also states that the CPB is subject to D.C. Nonprofit Corporation Act "to the extent consistent with this section [47 U.S.C. § 396]." *See id.* § 396(b).  The District of Columbia Nonprofit Corporation Act, in turn, creates a default rule that the power to remove board members at will is incident to the power of appointment: "Except as otherwise provided in the articles of incorporation or bylaws, a director who is appointed by persons other than the members may be removed with or without cause by those persons."  D.C. Code § 29-406.08(e).

17.     On April 28, 2025, when the President removed the Defendants, the CPB's articles of incorporation and bylaws contained no provision purporting to restrict the President's authority to remove board members.  *See* By-Laws of the Corporation for Public Broadcasting, as amended September 13, 2021 ("2021 By-Laws"), at §§ 2.01-2.02.

18.     Although the Public Broadcasting Act provides that "[t]he members of the Board shall not, by reason of such membership, be deemed to be officers or employees of the United States," 47 U.S.C. § 396(d)(2), and that the CPB "will not be an agency or establishment of the United States Government," *id.* § 396(b), the Act and other statutes provide many levers of government control and influence over the CPB:

- As noted above, all CPB board members are appointed by the President and confirmed by the Senate. *Id.* § 396(c)(1).

- Congress set forth specific qualifications for board members, including that no more than 5 members will be of the same political party, that board members must be "eminent in" relevant fields, and that the Board contain members who represent licensees and permittees of public television stations and public radio stations. *Id.* § 396(c)(1)-(3).

- Congress restricted the compensation of CPB officers and employees based on a federal employee pay scale. *Id.* § 396(e)(1).

- Congress authorized the CPB to take various actions "[i]n order to achieve the objectives and to carry out the purposes of" the Act. *Id.* § 396(g); *see also id.* § 396(a) (listing those objectives and purposes). The CPB funds "public telecommunications . . . programs," assists "in the development . . . of interconnection systems" and "public telecommunication entities." 47 U.S.C. § 396(g)(1). And the CPB is empowered to make grants, hire staff, make payments, and to "take any other actions" necessary to support its congressional purposes. *Id.* § 396(g)(2). Congress also "prohibited" the CPB from owning or operating broadcast stations or producing its own programming. *Id.* § 396(g)(3).

- The CPB is primarily funded through annual Congressional appropriations. *Id.* § 396(k)(1). For example, in 2024, Congress appropriated $535 million to the CPB for fiscal year 2026. *See* Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, 138 Stat. 460, 696, § 407.

- Congress sharply restricted how the CPB can use its funds, requiring it to use appropriated funds "solely for its grants, contracts, and administrative costs." 47 U.S.C. § 396(k)(2). Congress further required the CPB to establish an annual budget, and Congress set forth specific percentage requirements or limits for certain uses of funds. *Id.* § 396(k)(3).

- Only a small percentage of the funds appropriated to the CPB go to funding the CPB itself; the vast majority are disbursed in accordance with a highly reticulated statutory scheme to various local and national public-radio and public-broadcasting entities. *Id.* The CPB is, in short, a statutorily created body that exists to administer the disbursement of appropriations in accordance with a statutory scheme.

- Congress imposed various requirements on recipients of grants from the CPB, including that they hold open meetings, that public broadcast station grant recipients establish a community advisory board, and that employees of the Public Broadcasting System and National Public Radio cannot "be compensated in excess of reasonable compensation" while those organizations receive grants. *Id.* § 396(k)(4), (8), (9).

- The CPB must be audited by the Government Accountability Office ("GAO") in accordance with regulations promulgated by the Comptroller General, and the Comptroller General must report on such audits to Congress. *Id.* § 396(l).

- The Act provides that nothing in the Act "shall be deemed . . . *except to the extent authorized in subsection (b)*, to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over public telecommunications, or over the Corporation or any of its grantees or contractors, or over the charter or bylaws of the Corporation, or over the curriculum, program of instruction, or personnel of any educational institution, school system, or public telecommunications entity." *Id.* § 398(a) (emphasis added). The referenced subsection requires the CPB to incorporate into its grant agreements equal employment opportunity ("EEO") regulations promulgated by

the Secretary of Health and Human Services and empowers the Secretary to review claims of EEO violations and make final determinations on such claims. *Id.* § 398(b)(2), (3). That subsection also requires the CPB to provide an annual report to the Secretary of Health and Human Services. *Id.* § 398(b)(4).

- The CPB is a "designated Federal entity" under the Inspector General Act, 5 U.S.C. § 415(a)(1)(A), which means it has an Inspector General who conducts investigations and audits of CPB operations and issues reports to Congress, the CPB Board and management, and the public, *see* Office of the Inspector General, Corporation for Public Broadcasting, https://perma.cc/AAD4-G5DL (the CPB's Office of the Inspector General "conduct[s] independent audits, evaluations, and investigations" and "report[s] to Congress and the public about our activities").

- Congress holds oversight hearings regarding the CPB. *See, e.g.*, House Committee on Energy & Commerce, Oversight and Investigations Subcommittee Hearing: "Examining Accusations of Ideological Bias at NPR, a Taxpayer Funded News Entity," https://perma.cc/W284-W8GW (May 8, 2024).

## II.    Actions for Quo Warranto

19.    A quo warranto action is "used to inquire into the authority by which a public office is held or a franchise is claimed." *Quo Warranto*, Black's Law Dictionary (12th ed. 2024). Quo warranto began as a common law writ in medieval England and has been codified by statute in many jurisdictions. *See generally Paxton v. Annunciation House, Inc.*, No. 24-0573, 2025 WL 1536224, at *3-6 (Tex. May 30, 2025) (describing history of quo warranto).

20.    Quo warranto actions can be used to oust individuals who wrongfully purport to hold a public or corporate office. For example, in *Springer v. Government of Philippine Islands*, 277 U.S. 189 (1928), the government of the Philippines (then a United States possession) brought quo warranto actions seeking to oust purported directors of the Philippine National Coal Company and Philippine National Bank who had been elected by leaders of Congress; the Philippine government argued that only the Governor General of the Philippines had authority to appoint those directors. *See id.* at 197-199. The lower court ruled in favor of the Philippine government "and entered judgments of ouster against the" purported directors, and the Supreme Court affirmed. *Id.* at 200, 209.

21.    Congress via the D.C. Code has codified the quo warranto action by statute.  D.C. Code Judiciary and Judicial Procedure Act of 1983, Pub. L. No. 88-241, 77 Stat. 478 (Dec. 23, 1963) (codified as amended at D.C. Code §§ 16-3501–16-3548).

22.    Under the D.C. quo warranto statute, "[a] quo warranto may be issued from the United States District Court for the District of Columbia in the name of the United States against a person who within the District of Columbia usurps, intrudes into, or unlawfully holds or exercises, a franchise conferred by the United States or a public office of the United States, civil or military.  The proceedings shall be deemed a civil action."  D.C. Code § 16-3501.

23.    The Attorney General of the United States or the U.S. Attorney may institute such a proceeding in the name of the United States.  *Id.* § 16-3502.

24.    Where a defendant is found "to have usurped, intruded into, or unlawfully held or exercised an office or franchise, the verdict shall be that he is guilty of the act or acts in question, and judgment shall be rendered that he be ousted and excluded therefrom."  *Id.* § 16-3545.

## FACTUAL ALLEGATIONS

25.    Before April 28, 2025, the CPB had five members sitting on its Board: the three Defendants, Ruby Calvert, and Liz Sembler.  The remaining four spots on its Board were vacant.

26.    On April 28, 2025, the President removed each of the three Defendants from their positions as board member of the CPB.  Trent Morse, the Deputy Director of Presidential Personnel for the Executive Office of the President, communicated the President's removal of Defendants by sending them an email on April 28, 2025, informing them that the President was removing them effective immediately.

27.    Since April 28, 2025, the Defendants have usurped their former offices as board members of the CPB and continued to purport to act as board members.

I.     **Defendants Have Usurped Their Former Offices as Board Members of the CPB**

28.     For example, Defendants have continued to participate in CPB board meetings and vote on business that comes before the CPB's Board.

29.     On May 2, 2025, the CPB held a board meeting. The audio recording of the meeting posted on the CPB's website reflects that Kaplan participated and voted on matters coming before the Board; it is not clear from the recording whether the other two Defendants participated. *See* CPB, Board of Directors, Meetings, May 2, 2025, https://perma.cc/S6HG-8K3Z.

30.     On May 13, 2025, the CPB held a board meeting. The audio recording of the meeting posted on the CPB's website reflects that all three Defendants participated in the meeting and voted on matters coming before the Board. *See* CPB, Board of Directors, Meetings, May 13, 2025, https://perma.cc/7KK6-3E5S.

31.     On May 15, 2025, the CPB held a board meeting. At that meeting, the CPB Board purported to adopt a resolution amending the by-laws of the CPB. The CPB's website reflects that the resolution was purportedly adopted with four votes in favor, and one absent. *See* CPB, Board of Directors, Meetings, May 15, 2025, https://perma.cc/7FUW-7YPL. Thus, at least two Defendants, and possibly all three Defendants, participated in that meeting and voted to adopt the resolution.

32.     On June 10 and June 11, 2025, the CPB held a board meeting. The audio recording of the meeting posted on the CPB's website reflects that all three Defendants participated in the meeting and voted on matters coming before the Board. *See* CPB, Board of Directors, Meetings, June 10–11, 2025, https://perma.cc/6X9S-QQ7K.

33.     Defendants continued to usurp these offices even after losing in court. As plaintiffs in *CPB v. Trump*, Defendants filed a Motion for Temporary Restraining Order, which the parties later agreed to convert to a Motion for Preliminary Injunction, in which they sought an order

enjoining the government "from taking any steps to implement or give effect to" the "purported removal" of Defendants.  Prop. Order at 1, *CPB v. Trump*, ECF No. 2-3.  On June 8, 2025, the Court denied the motion.  *See* Mem. Op. & Order, *CPB v. Trump*, ECF No. 32.  Among other things, the Court held that the Defendants here (plaintiffs in *CPB v. Trump*) "have failed to demonstrate a likelihood of success on the merits" of their claim that the President lacked authority to remove Defendants.  *Id.* at 21.  The Court explained that under the Public Broadcasting Act and D.C. Nonprofit Corporation Act, "the President (as the appointing person) was authorized to remove the three directors at the time he acted," and that "the Court [was] unpersuaded" by Defendants' contrary arguments.  *Id.* at 15.

34.    Defendants acted as if the Court had ruled in their favor, instead of ruling against them.  Later that day, the CPB defiantly issued a press release stating that "the three individuals whom the President purported to remove, Laura G. Ross, Thomas E. Rothman, and Diane Kaplan, are, remain, and shall continue to be directors of the Board of the Corporation for Public Broadcasting."  CPB, Press Release, Court Recognizes CPB's Independence; Board Members Remain (June 8, 2025), https://perma.cc/ZJ6N-VVZV.  The press release did not acknowledge that the court denied the motion for preliminary injunction and held that the Defendants were not likely to succeed on the merits of their challenge to their removal.

35.    The CPB's website continues to list all three Defendants as members of the CPB Board of Directors.  *See* CPB, Board of Directors, https://perma.cc/YL9Y-ZKT7 (captured July 15, 2025).

## II.    The President Lawfully Removed Defendants from the Board of the CPB

36.    The President lawfully exercised his authority under the Public Broadcasting Act and Article II of the Constitution to remove Defendants as board members of the CPB.

37.     The Public Broadcasting Act authorizes the President to appoint (with the advice and consent of the Senate) the CPB's board members and contains no language restricting the President's right to remove them. *See* 47 U.S.C. § 496(c)(1). The Public Broadcasting Act therefore empowers the President to remove the CPB's board members.

38.     Ample authority, both longstanding and recent, establishes that the power to appoint someone to a position presumptively carries with it the incident power of removal, absent a clear restriction on that removal authority. At its base, "the power of removal [is] incident to the power of appointment." *In re Hennen*, 38 U.S. 230, 259 (1839) (holding that district court could remove court clerk because it appointed the clerk). "Because of the background presumption that the President may remove anyone he appoints, Congress must make it clear in a statute if it wishes to restrict the President's removal power." *Severino v. Biden*, 71 F.4th 1038, 1044 (D.C. Cir. 2023). "[T]o 'take away' the power of at-will removal from an appointing officer, Congress must use 'very clear and explicit language.'" *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. ___, 2025 WL 1773628, at *13 (June 27, 2025) (quoting *Shurtleff v. United States*, 189 U.S. 311, 315 (1903)).

39.     Beyond the general rule of interpretation that the power of removal is incident to the power of appointment, the President's legal authority to remove presidential appointees is additionally rooted in Article II of the Constitution, which vests him with the Executive Power and entrusts him to take care that the laws are faithfully executed. *See Myers v. United States*, 272 U.S. 52, 163-64 (1926).

40.     These legal principles fully apply to the CPB. It is true that the Public Broadcasting Act states that the CPB will be a nonprofit corporation and "not an agency or establishment of the United States Government." 47 U.S.C. § 396(b). But in considering whether a government-created corporation is part of the government for purposes of separation of powers, courts apply a

- 11 -

functional test that does not depend on whether Congress formally labeled the entity as a corporation rather than a government agency.

41.    The Supreme Court first applied this test in *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374 (1995).  The Supreme Court held that the National Railroad Passenger Corporation (commonly known as Amtrak) was "an agency or instrumentality of the United States for the purpose of individual rights guaranteed against the Government by the Constitution," even though the federal statute creating Amtrak structured it as a corporation and provided that Amtrak would not be a government agency.  *Id.* at 391, 394.  The Supreme Court held "that where, as here, the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government for purposes of the First Amendment." *Id.* at 399.

42.    *Lebron* involved a First Amendment claim, but the Supreme Court later applied similar analysis to hold that Amtrak is also "a governmental entity for purposes of the Constitution's separation of powers provisions." *Dep't of Transp. v. Ass'n of Am. R.Rs.*, 575 U.S. 43, 53-54 (2015).

43.    Under this test, the CPB clearly qualifies as part of the government.  First, the Public Broadcasting Act "create[d]" the CPB "by special law." *Lebron*, 513 U.S. at 399; *see* 47 U.S.C. § 396(b) ("There is authorized to be established a nonprofit corporation, to be known as the 'Corporation for Public Broadcasting.'").  Second, Congress created the CPB "for the furtherance of governmental objectives." *Lebron*, 513 U.S. at 599.  The Public Broadcasting Act lists those objectives, *see* 47 U.S.C. § 396(a), and prescribes specific mechanisms for the CPB to advance those objectives, *see, e.g., id.* § 396(g), (k).  Third, the federal government "retains for

itself permanent authority to appoint a majority of the directors of" the CPB. *Lebron*, 513 U.S. at 599. All directors of the CPB, not just a majority, are appointed by the President with the advice and consent of the Senate. 47 U.S.C. § 396(c)(1).

44.     Accordingly, the general legal principles establishing that the President has the authority to remove presidential appointees absent a clear restriction on his removal authority apply fully to the CPB.

45.     Even if Defendants were correct that the CPB should be viewed as a purely private D.C. nonprofit corporation, application of the D.C. Nonprofit Corporation Act would produce the same result: the President lawfully removed the Defendants. That act sets the same default rule for board members as the governing executive removal precedents: that the power to remove is incident to the power to appoint. Specifically, the D.C. Nonprofit Corporation Act provides that "[e]xcept as otherwise provided in the articles of incorporation or bylaws, a director who is appointed by persons other than the members may be removed with or without cause by those persons." D.C. Code § 29-406.08(e). Under that default rule, because the CPB's board members are "appointed by" the President, they "may be removed with or without cause by" the President. *Id.*

46.     As of April 28, 2025, when the President removed the Defendants, the bylaws and articles of incorporation of the CPB contained no provisions purporting to restrict the President's authority to remove board members.

47.     To be sure, on May 15, 2025, the CPB Board purportedly amended the bylaws to restrict the President's authority to remove board members. *See* CPB, Board of Directors, Meetings, May 15, 2025, https://perma.cc/7FUW-7YPL (purporting to adopt resolution amending the bylaws); By-Laws of the Corporation for Public Broadcasting, As Amended May 15, 2025,

§2.11 (purported amended bylaws stating "[n]o Director may be removed from the Board by any person or authority, including the President of the United States, without a two-thirds vote of the other Directors confirming such removal"). But that does not change the relevant analysis.

48.    Defendants were removed on April 28, 2025, seventeen days before the purported adoption of the amendment to the bylaws. Therefore, even if that amendment were duly adopted and lawful, it could not have affected the validity of the President's removal of Defendants on April 28, 2025, because it was not then in effect. In other words, Defendants were lawfully removed from the CPB Board long before the Board purportedly amended the bylaws.

49.    Moreover, the amendment was purportedly adopted by the Board that included the three Defendants, who had already been removed from the Board and were then usurping their positions. *See* CPB, Board of Directors, Meetings, May 15, 2025, https://perma.cc/7FUW-7YPL (stating that resolution to amend bylaws was adopted by "[f]our in favor, one absent"). That flaw renders the purported amendment null and void.

50.    Plus, the Public Broadcasting Act provides that the D.C. Nonprofit Corporation Act shall govern the CPB only "to the extent consistent with this section [47 U.S.C. § 396]." 47 U.S.C. § 396(b). But by authorizing the President to appoint board members and not restricting his removal authority, 47 U.S.C. § 396 itself authorizes the President to remove the board members. *See Braidwood*, 2025 WL 1773628, at *13; *Severino*, 71 F.4th at 1044. Thus, to the extent that the D.C. Nonprofit Corporation Act authorizes the CPB Board to restrict the President's ability to remove board members, it does not govern because it is not consistent with 47 U.S.C. § 396.

## CLAIM FOR RELIEF
### Quo Warranto, D.C. Code § 16-3501

51.    The United States incorporates the preceding paragraphs as if they were fully stated herein.

52.     Under the quo warranto statute, "[a] quo warranto may be issued from the United States District Court for the District of Columbia in the name of the United States against a person who within the District of Columbia usurps, intrudes into, or unlawfully holds or exercises, a franchise conferred by the United States or a public office of the United States, civil or military." D.C. Code § 16-3501.  The U.S. Attorney may institute such a proceeding.  *Id.* § 16-3502.

53.     Defendants do not lawfully hold the office of CPB board member and have not held that office since April 28, 2025, when the President removed them from that office.

54.     Since April 28, 2025, Defendants have been acting, and continue to act, as purported CPB board members, including by participating in board meetings, voting on matters coming before the Board, and presenting themselves to the public as board members.

55.     Therefore, Defendants are usurping and unlawfully holding or exercising the office of CPB board member.  Those offices are located within the District of Columbia, where the CPB is based and conducts business.

56.     The office of board member of the CPB is a "public office of the United States." D.C. Code § 16-3501.  It is such an office because it was created by federal statute, which established that board members are "appointed by the President, by and with the advice and consent of the Senate."  47 U.S.C. § 396(c)(1).

57.     In addition, under standards set by the Supreme Court, the CPB is considered part of the United States government because it is a corporation created by Congress to further governmental objectives, and it is led by the Board whose members are appointed by the President and confirmed by the Senate.  *See Lebron*, 513 U.S. at 599; *Ass'n of Am. R.Rs.*, 575 U.S. at 53–54.

58.     The United States respectfully requests that the Court enter judgment that Defendants "be ousted and excluded" from the office of board member of the CPB.  *Id.* § 16-3545. The Court should also grant appropriate ancillary relief, including return of any salary or payment Defendants have unlawfully taken by virtue of their usurpation of office.

## PRAYER FOR RELIEF

WHEREFORE, the United States respectfully requests that the Court issue an order:

a.     Declaring that Defendants do not lawfully serve as board members of the Corporation for Public Broadcasting and have not lawfully served as board members since the President removed them on April 28, 2025;

b.     Declaring that all official actions purportedly taken by Defendants as board members of the Corporation for Public Broadcasting after the President removed them on April 28, 2025, are null and void;

c.     Vacating and setting aside any official actions purportedly taken by Defendants as board members of the Corporation for Public Broadcasting after the President removed them on April 28, 2025

d.     Entering judgment that Defendants are ousted and excluded from the office of board member of the Corporation for Public Broadcasting;

e.     Enjoining Defendants from serving or purporting to serve as board members of the Corporation for Public Broadcasting;

f.     Ordering Defendants to refund the value of any salary or other compensation (monetary or otherwise) they have received on account of their purported service as board members of the Corporation for Public Broadcasting since the President removed them on April 28, 2025;

g.     Awarding the United States its costs in this action;

h.     Awarding any other relief that the Court deems just and proper.

*     *     *

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney


By: _____/s/ Brian P. Hudak_____
    BRIAN P. HUDAK, D.C. Bar #90034769
    Chief, Civil Division
    U.S. Attorney's Office
    601 D Street, NW
    Washington, DC 20530
    (202) 252-2500 (main)

CHAD MIZELLE
Acting Associate Attorney General

STANLEY E. WOODWARD, JR.
Counsel to the Attorney General

BRETT A. SHUMATE
Assistant Attorney General,
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General,
Civil Division

ALEXANDER K. HAAS
Director,
Federal Programs Branch

JACQUELINE COLEMAN SNEAD
Assistant Director,
Federal Programs Branch


By: _____/s/ Jeremy S.B. Newman_____
    JEREMY S.B. NEWMAN
    Trial Attorney
    United States Department of Justice
    Civil Division, Federal Programs Branch
    1100 L Street, N.W.
    Washington, DC 20005
    (202) 532-3114

Dated: July 15, 2025

*Attorneys for the United States of America*