**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Civil Action No. 25-2261 (RDM) |
| | ) |
| DIANE KAPLAN, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**MEMORANDUM IN SUPPORT OF DEFENDANT DIANE KAPLAN'S CROSS-**
**MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO UNITED STATES'**
**MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 3

    I.      Factual Background .................................................................................. 3

           A.   Ms. Kaplan, CPB, and the Pending Litigation.............................. 3

           B.   Appointment of the Designated Body.......................................... 5

    II.     Legal Background .................................................................................... 8

           A.   The Public Broadcasting Act ...................................................... 8

           B.   Quo Warranto Statute ................................................................ 10

LEGAL STANDARD................................................................................................... 11

ARGUMENT ............................................................................................................... 11

    I.      The Government Lacks Standing to Maintain This Lawsuit ................. 12

    II.     The Role of CPB Board Member Is Not a "Public Office".................. 16

    III.    Ms. Kaplan Was Not Lawfully Removed as a Member of the CPB Board.......... 17

           A.   The President's Purported Removal of Ms. Kaplan Without Cause Conflicts with the PBA .............................................................. 18

           B.   The PBA's Limitations on the President's Removal Power Are Constitutional.............................................................................. 22

    IV.    Even if the Court Determines That Ms. Kaplan Was Removed, She Is Lawfully Serving as a Member of a Designated Body ......................... 25

CONCLUSION............................................................................................................. 29

# TABLE OF AUTHORITIES

## CASES

*Abdellatif v. U.S. Dep't of Homeland Sec.*,
    109 F.4th 562 (D.C. Cir. 2024) ........................................................................ 13

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ......................................................................................... 11

*Behradrezaee v. Dashtara*,
    910 A.2d 349 (D.C. 2006) ................................................................................ 29

*Carlucci v. Doe*,
    488 U.S. 93 (1988) ........................................................................................... 20

*Carroll v. Trump*,
    49 F.4th 759 (2d Cir. 2022) ............................................................................. 21

*Collins v. Yellen*,
    594 U.S. 220 (2021) .................................................................................. 19, 23

*Dellinger v. Bessent*,
    No. 25-5028, 2025 WL 559669 (D.C. Cir. Feb. 15, 2025) ............................... 19

*Dep't of Transp. v. Ass'n of Am. R.Rs.*
    575 U.S. 43 (2015) ............................................................................... 23, 24, 25

*\*Edmond v. United States*,
    520 U.S. 651 (1997) ......................................................................................... 19

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ......................................................................................... 21

*\*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
    561 U.S. 477 (2010) .................................................................................. 19, 23

*Grocery Mfrs. Ass'n v. EPA*,
    693 F.3d 169 (D.C. Cir. 2012) ........................................................................ 12

*In re Hennen*,
    38 U.S. 258 (1839) ........................................................................................... 20

*Holcomb v. Powell*,
    433 F.3d 889 (D.C. Cir. 2006) ........................................................................ 11

*Humphrey's Ex'r v. United States*,
    295 U.S. 602 (1935) ................................................................................................ 23

*\*Kennedy v. Braidwood Mgmt., Inc.*,
    145 S. Ct. 2427 (2025) ................................................................................ 19, 20, 24

*Lebron v. Nat'l R.R. Passenger Corp.*,
    513 U.S. 374 (1995) ........................................................................................... 23, 24

*Love v. Vilsack*,
    908 F. Supp. 2d 139 (D.D.C. 2012) ..................................................................... 15

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ................................................................................................ 14

*Myers v. United States*,
    272 U.S. 52 (1926) .................................................................................................. 23

*Nat'l Res. Def. Council, Inc. v. EPA*,
    383 F. Supp. 3d 1 (D.D.C. 2019) ......................................................................... 11

*Nat'l Wildlife Fed'n v. United States*,
    626 F.2d 917 (D.C. Cir. 1980) .............................................................................. 21

*Operation Rescue Nat'l v. United States*,
    147 F.3d 68 (1st Cir. 1998) ................................................................................... 21

*Owner-Operator Indep. Drivers Ass'n v. U.S. Dep't of Transp.*,
    879 F.3d 339 (D.C. Cir. 2018) .............................................................................. 13

*Pub. Citizen, Inc. v. Trump*,
    297 F. Supp. 3d 6 (D.D.C. 2018) ......................................................................... 14

*Pub. Inv. Ltd. v. Bandeirante Corp.*,
    740 F.2d 1222 (D.C. Cir. 1984) ............................................................................ 29

*Robinson v. Shell Oil Co.*,
    519 U.S. 337 (1997) ................................................................................................ 17

*\*Seila Law, LLC v. Consumer Fin. Prot. Bureau*,
    591 U.S. 197 (2020) ................................................................................... 19, 22, 23

*\*Severino v. Biden*,
    71 F.4th 1038 (D.C. Cir. 2023) ...................................................................... 20, 21

*Sibley v. Alexander,*
    916 F. Supp. 2d 58 (D.D.C. 2013) ................................................................ 12

*State ex rel. Woodford v. North,*
    42 Conn. 79 (1875) ..................................................................................... 17

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) .................................................................................... 12

*Trump v. Wilcox,*
    145 S. Ct. 1415 (2025) ........................................................................... 13, 23

*\*U.S. ex rel. Totten v. Bombardier Corp.,*
    380 F.3d 488 (D.C. Cir. 2004) ................................................................... 24

*U.S. Inst. of Peace v. Jackson,*
    783 F. Supp. 3d 316 (D.D.C. 2025) ........................................................... 23

*Yazzie v. Nat'l Org. for Women,*
    712 F. Supp. 3d 56 (D.D.C. 2024) ............................................................. 11

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 597 (1952) .................................................................................... 22

**STATUTES**

*47 U.S.C. § 396 ............................................... 2, 4, 5, 8, 9, 10, 13, 16, 17, 18, 20, 25, 26

*47 U.S.C. § 398 ................................................................................................. 9, 19

*D.C. Code § 16-3501 ...................................................................................... 2, 10, 16

D.C. Code § 16-3545 ............................................................................................. 10

*D.C. Code § 29-401.02(8) ..................................................................................... 26

*D.C. Code § 29-406 ....................................................................................... 5, 20, 26

**FEDERAL RULES**

Fed. R. Civ. P. 56 ................................................................................................. 11

**OTHER AUTHORITIES**

*Corp. for Pub. Broad. v. Trump,*
    No. 25-cv-1305 (RDM), 2025 WL 1617191 (D.D.C. June 8, 2025) ....... 1, 3, 4, 5, 17, 22, 26

H.R. Rep. No. 90-572 (1967)................................................................................................... 9

President Lyndon B. Johnson, Remarks Upon Signing the Public Broadcasting Act of 1967
    (Nov. 7, 1967), https://www.presidency.ucsb.edu/documents/remarks-upon-signing-the-
    public-broadcasting-act-1967 ..................................................................................... 9

Public Broadcasting Act of 1967
    Pub. L. No. 90-129, 81 Stat. 365 (1967)...................................................................... 2

S. Rep. No. 90-222 (1967)...................................................................................................... 9

# INTRODUCTION

Defendant Diane Kaplan—a longtime public radio executive appointed to the Board of Directors of the Corporation for Public Broadcasting ("CPB") in 2022—is not usurping a public office by continuing to perform her duties on behalf of CPB. Even though the Public Broadcasting Act expressly insulates CPB from any "direction, supervision, or control" by the government, President Trump purported to fire Ms. Kaplan without any reason in April 2025. CPB, the Board, and Ms. Kaplan are challenging that decision in a separate lawsuit, *CPB v. Trump*. Although the Court has not yet ruled on the merits of whether President Trump had the authority to remove Ms. Kaplan, she is lawfully exercising her duties regardless of how the Court rules: either she remains a CPB Board member, in which case she is entitled to exercise all the powers of that position, or she is serving as a member of a designated body, in which case she has all the same powers for the purposes relevant here.

The Government's request to oust Ms. Kaplan from her role as a CPB Board member fails as a matter of law, for four reasons.

*First*, as an initial matter, this dispute is "a question of nomenclature" that does not give rise to Article III standing. *See* Argument Section I. The Government complains that Ms. Kaplan is purporting to serve as a current Board member, but it identifies no concrete and particularized injury that is traceable to Ms. Kaplan and redressable by this Court. Because Ms. Kaplan may exercise the powers of which the Government complains regardless of whether she is serving as a Board member or as a member of a designated body, the Government's requested action to oust her from the role of CPB Board member would have no practical effect, and the Government therefore lacks standing.

1

*Second*, Ms. Kaplan is entitled to summary judgment because the role of CPB Board member is not a "public office." *See* Argument Section II. The Government's cause of action, arising from the quo warranto statute codified in D.C. Code § 16-3501, cannot be maintained unless Ms. Kaplan is holding or exercising a "public office." But the Public Broadcasting Act of 1967, as amended ("PBA"), Pub. L. No. 90-129, 81 Stat. 365 (1967), expressly provides that CPB is "not . . . an agency or establishment of the United States Government," 47 U.S.C. § 396(b), and that its Board members "shall not, by reason of such membership, be deemed to be officers or employees of the United States," *id.* § 396(d)(2).

*Third*, even if Ms. Kaplan is holding or exercising a "public office," it is not one that she is exercising without authority. For one, she was not lawfully removed from that role. *See* Argument Section III. The PBA neither expressly nor impliedly authorizes the President to remove CPB's Board members at will, and Ms. Kaplan's removal—purported to be carried out without any reason—conflicts with that statute. In addition, contrary to the Government's suggestion, the PBA's express prohibition on governmental supervision or control—such as that effectuated through removal or the threat of removal—does not unconstitutionally restrain the President's Article II powers.

*Finally*, even if this Court concludes that Ms. Kaplan was properly removed by the President, she is not unlawfully holding a public office because she is separately authorized by the PBA's cross-reference to the D.C. Nonprofit Corporation Act to exercise the very powers of which the Government complains—among them participating in meetings, making statements at those meetings, and voting on matters relating to CPB—as a member of a designated body. *See* Argument Section IV. Ms. Kaplan's service on that body is fully consistent with the PBA, D.C. Code, CPB's By-laws, and other applicable law.

For these reasons and as explained in more detail below, the Court should deny the Government's motion for summary judgment and grant Ms. Kaplan's cross-motion.

## BACKGROUND

### I.    Factual Background

#### A.    Ms. Kaplan, CPB, and the Pending Litigation

Ms. Kaplan is the sole defendant in this action and one of three remaining plaintiffs in *CPB v. Trump*, Case No. 25-cv-1305 (RDM), along with CPB and its Board of Directors.[1]

CPB is a private nonprofit corporation dedicated to the support of public broadcasting. *See Defendant Diane Kaplan's Response to the United States' Statement of Material Facts and Statement of Additional Facts ("SOMF") ¶¶ 23-26. It is the largest single source of funding for public radio, television, and related online and mobile services. *See id.* ¶ 25. CPB also funds infrastructure that delivers public media content and emergency alerts to local stations. *See id.* CPB's mission is to ensure universal access to non-commercial, high-quality content and telecommunications services. *See id.* ¶ 26. It does so by distributing more than 70% of its funding to more than 1,500 locally owned public radio and television stations. *See id.*

Having worked for decades as an executive in public broadcasting, Ms. Kaplan, a registered independent, was nominated by President Biden to be a member of CPB's Board with the bipartisan support of the two Senators of her home state of Alaska. The Senate confirmed her nomination, and she was appointed by the President in December 2022. The PBA provides that one Board member "shall be selected from among individuals who represent the licensees and

---

[1] Ms. Kaplan and CPB are separately represented, and Ms. Kaplan's arguments in this action overlap with, but are not identical to, the arguments raised by the plaintiffs in *CPB v. Trump*, which she joined in part.

permittees of public radio stations," 47 U.S.C. § 396(c)(3), and Ms. Kaplan is the person selected for that seat.

On April 28, 2025, Ms. Kaplan and two other Board members received an email from one of President Trump's aides, purporting to notify them that their positions on the Board were terminated. *See id.* ¶ 63. This email stated: "On behalf of President Donald J. Trump, I am writing to inform you that your position on the Corporation for Public Broadcasting is terminated effective immediately. Thank you for your service." *See id.* ¶ 64. The email did not identify any authority under which the President was purporting to terminate the Board members, nor did it provide a reason for the purported termination. *See id.* ¶¶ 65-66. Ms. Kaplan has never been given a reason for her purported termination. *See id.* ¶ 66.

The next day, April 29, 2025, CPB, its Board of Directors, and Ms. Kaplan and the two other purportedly terminated Board members (collectively, "CPB Plaintiffs") filed their complaint and motion for temporary restraining order in *CPB v. Trump*. ECF Nos. 1, 2. They asked the Court to "[d]eclare that the email purporting to remove Plaintiffs . . . is of no legal effect" and to issue a temporary restraining order "prohibiting the Defendants from taking any action which gives effect to the [April 28, 2025 email] or otherwise seeks to interfere with or control the governance and operations of CPB." Compl. at 22, *CPB v. Trump*, ECF No. 1. On June 8, 2025, the Court denied the CPB Plaintiffs' motion, which the parties had agreed to convert to a preliminary injunction motion, "without prejudice to Plaintiffs renewing their motion should Defendants (or those acting in concert with them) take steps to interfere in the independence of the Corporation." PI Order at 4, *CPB v. Trump*, ECF No. 32. The parties then proceeded to summary judgment briefing.

On July 15, 2025, before the Court had an opportunity to consider the parties' summary judgment briefing or rule on the merits of the CPB Plaintiffs' lawsuit, the Government filed this

quo warranto action against the three individual plaintiffs in *CPB v. Trump*, two of whom were voluntarily dismissed after stating that they no longer held the office. *See* ECF Nos. 1, 6, 8; Minute Orders of July 29, 2025 and Aug. 1, 2025. Ms. Kaplan is the sole remaining defendant in this action.

### B.    Appointment of the Designated Body

At a May 14, 2025 hearing in *CPB v. Trump*, the Court recognized that CPB may continue to operate through a "designated body," a mechanism available under its By-laws and D.C. law. *See, e.g.*, May 14, 2025 Tr. at 7 ("[W]hy not then take advantage of the designated body provision?"); *id.* at 8 ("[A]t least until the case is resolved, why not just designate individuals pursuant to the designated body provision of the DC law and the bylaws?"); *id.* ("[T]he DC Nonprofit Corporation Act and your bylaws contemplate that . . . there is a mechanism that allows [CPB] to continue to operate through a designated body."). Following the hearing, the President and CEO of CPB appointed a contingent designated body that includes Ms. Kaplan. *See* SOMF ¶¶ 71-72.

In establishing CPB as a nonprofit corporation, Congress provided that CPB "shall be subject . . . to the District of Columbia Nonprofit Corporation Act" "to the extent consistent with" the PBA. 47 U.S.C. § 396(b). The D.C. Nonprofit Corporation Act requires a board to have at least three members. *See* D.C. Code § 29-406.03. The Act also provides for the appointment of a "designated body" to perform "[s]ome, but less than all, of the powers, authority, or functions of the board of directors of a nonprofit corporation" as provided for in the articles of incorporation or by-laws of a nonprofit corporation. *Id.* § 29-406.12(a).

CPB's By-laws, as amended as of September 13, 2021 and May 15, 2025, provide for the appointment of a designated body in the event that CPB's Board falls below the statutorily required number of members.[2] *See* SOMF ¶¶ 56-57, 59, 62.

Article V, titled "Designated Body," provides:

Section 5.01. **Application.** This Article shall apply only in the instance that the Corporation's Board fails to meet the statutory minimum number of directors required under the D.C. Nonprofit Corporation Act. All references to rights and responsibilities of the Board, in these By-Laws, the Articles of Incorporation, or applicable statutes, shall apply to a Designated Body which shall be authorized to perform the functions of the Board in that instance, with the exception of the authority to remove Directors under the D.C. Nonprofit Corporation Act.

Section 5.02. **Responsibilities and Membership.** If less than the statutory minimum number of presidentially appointed Directors of the Corporation remain in office, a Designated Body, consisting of three (3) members, shall exercise the rights and responsibilities of the Board until such time as there are three (3) presidentially appointed Directors. Members of the Designated Body shall include the remaining presidentially appointed Directors plus the number of former Directors, appointed as provided in Section 5.03, as are required for a total of three (3) members. The Designated Body shall be authorized to perform the functions of the Board for the period of time only until at least the statutory minimum number of Directors are in office.

Section 5.03. **Appointed Members.** The President and Chief Executive Officer of the Corporation shall select and appoint to the Designated Body the required number of individuals who most recently served as Directors of the Corporation who were nominated by the President and confirmed by the Senate, whose service on the Board ended by operation of law and not by earlier vacating office, and who agree to serve. Such former Directors shall be selected in the order in which they most recently served as Directors, and shall be removed in the order in which they were most recently appointed to serve on the Designated Body. The President and Chief executive Officer shall ensure the continued presence of three (3) members by appointing former Directors to fill any vacancies that occur, and by removing them from service when new presidentially appointed Directors take office. The

---

[2] The Government has argued that the May 2025 By-laws are "null and void" because some of the Board members who voted on the amendment purportedly had been removed by the President. *See* Gov't SJ Mem. at 40. Ms. Kaplan does not concede this point, and she reserves all rights, but this contention does not affect her argument here.

Designated Body shall cease to function as soon as three (3) presidentially appointed Directors are in office.

*See id.* ¶ 59.

On June 8, 2025, Patricia De Stacy Harrison, President and Chief Executive Officer of CPB, signed a "Determination of the President and CEO Pursuant to Article V of the Bylaws" (the "Determination"). *See id.* ¶ 71. The Determination provides, in part:

> NOW, THEREFORE, pursuant to Section 5.03 of the CPB Bylaws, I have the authority to appoint a Designated Body to act as a Board when the number of directors purports to fall below the statutorily required number. While it is CPB's position that its Board of Directors' membership has remained unchanged notwithstanding the purported actions of the President, I hereby invoke my authority under Article V of the Bylaws to appoint a contingent Designated Body to avoid any later challenge in the event CPB's position is not sustained. I further affirm and state that Tom Rothman, Diane Kaplan, and Laura Ross are, have been, and will continue to be members of the Board of Directors of the Corporation for Public Broadcasting.
>
> Under the Bylaws, "Such former Directors shall be selected in the order in which they most recently served as Directors." Given that each of the directors purported to be removed was given that communication simultaneously, I cannot determine which director should be given priority. Accordingly, I hereby appoint Tom Rothman, Diane Kaplan, and Laura Ross to the Designated Body to join Ruby Calvert and Liz Sembler whose Board membership is not at issue.

*See id.* ¶ 72.

In a sworn declaration attached to this filing, Evan Slavitt, CPB's Executive Vice President and General Counsel, has confirmed that it is CPB's view that, in the event that CPB's position regarding the Board of Directors' membership is not sustained, Ms. Kaplan would be serving as a member of a valid designated body, consistent with CPB's By-laws, the D.C. Code, and other applicable law. *See id.* ¶ 74. Mr. Slavitt has further confirmed that it is CPB's view that, in the event that CPB's position regarding the Board of Directors' membership is not sustained, the contingent designated body comprising Ms. Calvert, Ms. Sembler, and Ms. Kaplan is fully

consistent with CPB's By-laws, the D.C. Code, and other applicable law. *See id.* ¶ 75.

Pursuant to CPB's By-Laws, the designated body is authorized to perform all the functions of the Board, with the exception of the authority to remove Directors under the D.C. Nonprofit Corporation Act. *See id.* ¶ 76. Ms. Kaplan has not exercised (or purported to exercise) that removal power.

## II.    Legal Background

### A.    The Public Broadcasting Act

In 1967, Congress established CPB as "a nonprofit corporation . . . which will not be an agency or establishment of the United States Government." 47 U.S.C. § 396(b). It provided for CPB to be governed by a Board of nine members to be appointed by the President, by and with the advice and consent of the Senate. *See id.* § 396(c)(1). It specified the qualifications of these Board members, providing that they would be drawn from among "citizens of the United States (not regular full-time employees of the United States)" who are "eminent in such fields as education, cultural and civic affairs, or the arts, including radio and television." *Id.* § 396(c)(2). It further specified that "no more than 5 members of the Board . . . may be members of the same political party." *Id.* § 396(c)(1). The PBA also specified that these Board members "shall not, by reason of such membership, be deemed to be officers or employees of the United States." *Id.* § 396(d)(2).

Appointment of the Board (with the advice and consent of the Senate) is the only power that the PBA grants to the President. The PBA does not expressly authorize the President to remove CPB's Board members. Nor does it provide that the Board members serve at the will or pleasure of the President or authorize the President to exercise any other form of control over the Corporation. *See id.* ¶ 33.

To the contrary, Congress took highly unusual steps to insulate CPB from government influence and control and to secure its nonpolitical nature. Most notably, Congress precluded the

possibility of government control by providing in a subsection titled "Prohibition" that: "Nothing contained in this part shall be deemed . . . to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control . . . over the Corporation or any of its grantees or contractors, or over the charter or bylaws of the Corporation." 47 U.S.C. § 398(a). It moreover authorized CPB to "carry out its purposes and functions and engage in its activities in ways that will most effectively assure the maximum freedom of the public telecommunications entities and systems from interference with, or control of, program content or other activities." 47 U.S.C. § 396(g)(1)(D).

Committee reports accompanying the enactment of the PBA confirm Congress's clear intent to establish CPB as a "independent entity . . . free of political pressures," S. Rep. No. 90-222, at 4, 11 (1967), and structured to maximize "insulation from Government control or influence," including by barring "Government employees" from its Board of Directors, H.R. Rep. No. 90-572, at 15 (1967). In public remarks at the signing of the PBA, President Johnson emphasized that CPB would "be carefully guarded from Government or from party control" and would be "free" and "independent." President Lyndon B. Johnson, Remarks Upon Signing the Public Broadcasting Act of 1967 (Nov. 7, 1967), https://www.presidency.ucsb.edu/documents/remarks-upon-signing-the-public-broadcasting-act-1967.

Consistent with Congress's intent to insulate CPB from government influence and control, CPB has operated throughout its history as a private corporation, rather than as part of the executive branch or federal government. *See* SOMF ¶ 43. No past President has ever sought to direct CPB's day-to-day operations, remove a CPB Board member, or control CPB's actions through the threat of removal. *See id.* No one, including the federal government, has an ownership interest in CPB. *See id.* ¶ 44. CPB also lacks many of the attributes common to government entities.

For instance:

- CPB does not and cannot issue any regulations.

- CPB does not and cannot regulate or adjudicate disputes (such as between public radio or television stations and members of the public).

- CPB is not subject to Freedom of Information Act requests.

- CPB operates from private offices leased from a private corporation.

- Until recently, CPB has been forward-funded.

- CPB is not listed in the United States Government Manual, the "official handbook" of the federal government published by the National Archives and Records Administration, as a governmental or quasi-governmental agency.

*See id.* ¶¶ 45-53.

The PBA also provided that any gaps in the legislation would be filled specifically by D.C. nonprofit corporation law. The PBA states, in relevant part, that CPB "shall be subject to the [PBA], and, to the extent consistent with this section, to the District of Columbia Nonprofit Corporation Act." 47 U.S.C. § 396(b).

## B.    Quo Warranto Statute

The Government has brought this action under the quo warranto statute codified in the D.C. Code. This statute provides:

> A quo warranto may be issued from the United States District Court for the District of Columbia in the name of the United States against a person who within the District of Columbia usurps, intrudes into, or unlawfully holds or exercises, a franchise conferred by the United States or a public office of the United States, civil or military. The proceedings shall be deemed a civil action.

D.C. Code § 16-3501. Where a defendant is found "to have usurped, intruded into, or unlawfully held or exercised an office or franchise, the verdict shall be that he is guilty of the act or acts in question, and judgment shall be rendered that he be ousted and excluded therefrom." *Id.* § 16-3545.

## LEGAL STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). "A fact is 'material' if it is capable of affecting the outcome of the litigation," *Yazzie v. Nat'l Org. for Women*, 712 F. Supp. 3d 56, 73 (D.D.C. 2024), and "[a] dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *id.* Moreover, "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). The Court "must view the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in that party's favor." *Nat'l Res. Def. Council, Inc. v. EPA*, 383 F. Supp. 3d 1, 6 (D.D.C. 2019) (citing *Liberty Lobby*, 477 U.S. at 255)).

## ARGUMENT

Ms. Kaplan is not "usurping" a public office as the Government claims. Instead, she is acting within the proper scope of her role at CPB, either as a member of the Board or as a member of a designated body. This Court should deny the Government's motion for summary judgment and grant Ms. Kaplan's cross-motion for four reasons: (1) the Government lacks standing to maintain its quo warranto claim; (2) the position of CPB Board member is not a "public office" for purposes of the quo warranto statute; (3) Ms. Kaplan is exercising the role of Board member with authorization because she was never lawfully removed from that role; and (4) in the event this Court were to conclude that Ms. Kaplan was properly removed as a Board member, she would be serving as a member of the contingent designated body.

## I.     The Government Lacks Standing to Maintain This Lawsuit

The Government lacks Article III standing because it has not suffered any injury in connection with Ms. Kaplan's continued service on behalf of CPB, let alone a concrete, particularized injury traceable to Ms. Kaplan and redressable by this Court. In particular, because Ms. Kaplan can exercise the exact powers of which the Government complains regardless of whether she is serving as a Board member or a member of the designated body, the Government's requested action to oust her from the role of CPB Board member would have no practical effect, and the Government therefore lacks standing.

The well-established requirements of Article III standing are an injury in fact, causation, and redressability. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). The Government bears the burden of establishing these elements. *See Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 174 (D.C. Cir. 2012) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). "Put another way, a plaintiff must establish: (1) that he suffered an 'injury in fact', (2) that the injury is 'fairly traceable' to the challenged action, and (3) that it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Sibley v. Alexander*, 916 F. Supp. 2d 58, 61 (D.D.C. 2013) (quoting *Grocery Mfrs. Ass'n*, 693 F.3d at 174). Here, the Government has not met these standing requirements for the reasons explained below.

*First*, the Government contends that it is "harmed by the obstruction of the President's exercise of his removal authority, regardless of the level of impact on the organization's actions going forward." Memorandum in Support of Plaintiff's Motion for Summary Judgment, ECF No. 14-1 ("Gov't SJ Mem.") at 21. This boils down to an abstract assertion that the Government is somehow harmed by Ms. Kaplan's being labeled as a "Board member" while it believes she has been removed and even though she can perform the functions of which the Government complains as a member of the contingent designated body. This Court has not yet ruled on the merits of

whether Ms. Kaplan continues to be a Board member, but to the extent it determines that she is not, Ms. Kaplan will certainly comply with that ruling and will not hold herself out as a member of the Board. Thus, even the Government's abstract assertion of harm will not come to pass. Moreover, as this Court has noted, mere disagreement over the labeling of Ms. Kaplan's role at CPB is a question of nomenclature that does not give rise to a sufficient injury. *See* Aug. 27, 2025 Tr. at 16; *cf. Abdellatif v. U.S. Dep't of Homeland Sec.*, 109 F.4th 562, 568 (D.C. Cir. 2024) ("[I]n standing terms, maintaining erroneous information, without more, does not create a 'concrete injury' of the sort Article III requires."); *Owner-Operator Indep. Drivers Ass'n v. U.S. Dep't of Transp.*, 879 F.3d 339, 344-45 (D.C. Cir. 2018) (concluding that plaintiffs' claim that a website included inaccurate information did not amount to an injury sufficient to establish standing).

The Government's citation to *Trump v. Wilcox*, 145 S. Ct. 1415, 1415 (2025), is not to the contrary. *See* Gov't SJ Mem. at 20. In that case, the Supreme Court found irreparable harm sufficient to support a temporary stay stemming from the President's removal of certain executive branch officers. *Id.* But those officers lacked an alternative basis for performing the functions of the office from which they were removed. Here, as discussed, Ms. Kaplan has an alternative basis for performing her Board functions, namely, as a member of the contingent designated body. *See* Argument Section IV.

*Second*, the Government contends that "there are practical differences between service as a Board member and service" as a member of a designated body, noting that service on a designated body is "inherently temporary." Gov't SJ Mem. at 14. Although it is true that service on a designated body is temporary in nature, so too is service as a Board member, which is limited to the fixed terms set by the PBA. *See* 47 U.S.C. § 396(c)(5). And although Ms. Kaplan's service on a contingent designated body may be ended by the confirmation of a third Board member, it is

entirely unknown whether or when the President might nominate or the Senate might confirm such a person. It is pure speculation at this point that her service on a designated body would be any shorter than her remaining service as a Board member (and, indeed, it could be longer). The "practical differences" cited by the Government, Gov't SJ Mem. at 14, are thus "'conjectural' or 'hypothetical'" rather than the sort of "concrete and particularized" injury on which standing must be based. *Lujan*, 504 U.S. at 560 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)); *see also Pub. Citizen, Inc. v. Trump*, 297 F. Supp 3d 6, 19 (D.D.C. 2018).

*Third*, the Government makes several arguments that question the contingent designated body and Ms. Kaplan's service on such a body, contending that it is uncertain whether she will ever serve on a designated body and suggesting that her service on such a body may not comply with the PBA. Gov't SJ Mem. at 21-22. But the status of her service on the contingent body is not so uncertain: if this Court rules that Ms. Kaplan was properly removed, the CPB Board will have fallen below its statutorily required number of members, in which case the designated body— including Ms. Kaplan—will have come into being under the Designation. *See* SOMF ¶¶ 4-5. And the Government's suggestion that the constitution of a designated body may conflict with the PBA is meritless for the reasons explained in Argument Section IV.

*Finally*, even if the Government's various assertions of injury were sufficiently concrete for Article III standing, it has still failed to meet the requirements of traceability and redressability. According to the Government's own statement of undisputed facts, the alleged harm is not traceable to the conduct at issue—namely, Ms. Kaplan's alleged usurpation of the role of CPB Board member. The Government contends that Ms. Kaplan "has continued to purport to serve as a Board member," citing such actions as participating in meetings, making statements at those meetings, and voting on matters relating to CPB. Gov't SJ Mem. at 17; *see also id.* at 15-16. But

these actions are not unique to Board members: Ms. Kaplan is authorized to take them as either a Board member or a member of the contingent designated body. *See* SOMF ¶ 77. Thus, even assuming that the Government has suffered an injury, that harm would not be traceable to Ms. Kaplan's "purporting to serve as a current Board member." *See* Gov't SJ Mem. at 20; *see also* ECF No. 1 at 1 (Compl. ¶ 1) (describing Ms. Kaplan as "usurping and purporting to exercise unlawfully the office of board member of the Corporation for Public Broadcasting").

Because the requested relief would not affect Ms. Kaplan's ability to engage in any of the complained-of activities, the alleged injury is also not redressable. To satisfy redressability, "a plaintiff must show in the first instance that the court is capable of granting the relief sought." *Love v. Vilsack*, 908 F. Supp. 2d 139, 144-45 (D.D.C. 2012). But granting the Government's requested relief would have no practical effect because Ms. Kaplan could perform the same duties as a member of the designated body even if the Court were to grant every request in the Government's Prayer for Relief:

> a. Declaring that Defendants do not lawfully serve as board members of the Corporation for Public Broadcasting and have not lawfully served as board members since the President removed them on April 28, 2025;
>
> b. Declaring that all official actions purportedly taken by Defendants as board members of the Corporation for Public Broadcasting after the President removed them on April 28, 2025, are null and void;
>
> c. Vacating and setting aside any official actions purportedly taken by Defendants as board members of the Corporation for Public Broadcasting after the President removed them on April 28, 2025[;]
>
> d. Entering judgment that Defendants are ousted and excluded from the office of board member of the Corporation for Public Broadcasting;
>
> e. Enjoining Defendants from serving or purporting to serve as board members of the Corporation for Public Broadcasting;
>
> f. Ordering Defendants to refund the value of any salary or other compensation (monetary or otherwise) they have received on account of their purported service

as board members of the Corporation for Public Broadcasting since the President removed them on April 28, 2025;

g. Awarding the United States its costs in this action;

h. Awarding any other relief that the Court deems just and proper.

ECF No. 1 at 16 (Compl.). Ms. Kaplan may perform all of these Board functions as a member of the designated body. *See* SOMF ¶¶ 76-77. Indeed, under the CPB By-laws, "[a]ll references to rights and responsibilities of the Board, in these By-Laws, the Articles of Incorporation, or applicable statutes, shall apply to a Designated Body," with the exception of the authority to remove Directors. *See id.* ¶ 59.

The Government therefore has failed to meet its burden of demonstrating the injury-in-fact, traceability, and redressability requirements of Article III standing.

## II.    The Role of CPB Board Member Is Not a "Public Office"

The Government's claim fails at another threshold step: the quo warranto statute requires Ms. Kaplan to have usurped "a public office of the United States," D.C. Code § 16-3501, but CPB Board members do not hold such a "public office." To the contrary, the PBA placed the CPB outside the government and took steps to insulate it from government control, including by providing that its Board members "shall not . . . be deemed to be officers or employees of the United States." 47 U.S.C. § 396(d)(2). This statutory designation precludes the Government's request for relief.

Under the D.C. Code, "[a] quo warranto may be issued . . . against a person who within the District of Columbia usurps, intrudes into, or unlawfully holds or exercises, a franchise conferred by the United States or a public office of the United States, civil or military." D.C. Code § 16-3501. This public-office requirement is a vestige of the common-law quo warranto writ codified in the D.C. Code: it was "well settled that . . . a quo warranto [claim] will not lie to try the right to

an office that is not a legally authorized public office." *State ex rel. Woodford v. North*, 42 Conn. 79, 86 (1875).

The D.C. Code does not define "public office," but the PBA makes the status of CPB's Board clear. As this Court has already recognized in *CPB v. Trump*, "the Corporation is not 'an agency or establishment of the United States Government,'" and "the members of the Board are not 'officers or employees of the United States.'" *See* PI Order at 2, *CPB v. Trump*, ECF No. 32 (quoting and citing 47 U.S.C. §§ 396(b), (d)). Given the clarity with which Congress has spoken about the private, rather than public, nature of CPB and its Board, this should be the end of the inquiry. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) (The "first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case. [The] inquiry must cease if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 240 (1989))).

## III.    Ms. Kaplan Was Not Lawfully Removed as a Member of the CPB Board

Ms. Kaplan is also entitled to summary judgment on another ground: she was not lawfully removed by the President and therefore continues to properly to exercise her role as a CPB Board member. The provisions of the PBA that prohibit government interference with CPB are flatly inconsistent with at-will removal of CPB Board members by the President. The PBA's cross-reference to the D.C. Nonprofit Corporation Act, including the provision regarding the removal of members of nonprofit boards, therefore cannot be read to allow the President to remove CPB Board members at will.

A.    **The President's Purported Removal of Ms. Kaplan Without Cause Conflicts with the PBA**

The PBA provides no express authority for the President to remove CPB's Board members. *See* SOMF ¶ 33. To the contrary, Congress through the PBA took extensive measures to shield CPB and its Board from supervision and control by the Government. First, Congress defined CPB to be a nonprofit corporation and "not . . . an agency or establishment of the United States Government," 47 U.S.C. § 396(b), and it stated that its Board members "shall not, by reason of such membership, be deemed to be officers or employees of the United States," *id.* § 396(d)(2). These provisions effectuate Congress's statement of policy that "a private corporation should be created . . . to afford maximum protection from extraneous interference and control." *Id.* § 396(a)(10).

Second, and more importantly, Congress included in the PBA highly unusual language that precludes the Government from exercising supervision or control over CPB. Specifically, the PBA provides that:

> Nothing contained in this part shall be deemed . . . to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over public telecommunications, or over the Corporation or any of its grantees or contractors, or over the charter or bylaws of the Corporation, or over the curriculum, program of instruction, or personnel of any educational institution, school system, or public telecommunications entity.

*Id.* § 398(a). Consistent with these provisions, the CPB has operated throughout its history as a private corporation, rather than as part of the executive branch or federal government. *See* SOMF ¶ 43. Until President Trump's actions, no President had ever sought to remove a CPB Board member or to otherwise supervise, direct, or control CPB's actions in violation of this provision. *See id.*

These provisions preclude the possibility of at-will removal power for the President. As the Supreme Court and D.C. Circuit repeatedly have recognized, removal is one of the most

powerful forms of control and supervision. *Kennedy v. Braidwood Mgmt., Inc.*, 145 S. Ct. 2427, 2445 (2025) ("At-will removal is one means of ensuring supervision and direction."); *see also Seila Law, LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 204 (2020) ("The President's power to remove—and thus supervise—those who wield executive power on his behalf follows from the text of Article II [and] was settled by the First Congress . . . ."); *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 510 (2010) ("In particular, we noted that 'the power to remove officers' at will and without cause 'is a powerful tool for control . . . .'"); *Edmond v. United States*, 520 U.S. 651, 664 (1997) ("The power to remove officers . . . is a powerful tool for control."); *Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *16 (D.C. Cir. Feb. 15, 2025) ("[T]he President must be able to remove—and thus 'maintain a degree of control over'—subordinates through whom he exercises his executive power." (quoting *Collins v. Yellen*, 594 U.S. 220, 252 (2021))). "The prerogative of at-will removal of a subordinate" "creates a 'here-and-now subservience'" that "carries with it the power to supervise and direct that subordinate." *Kennedy*, 145 S. Ct. at 2443 (quoting *Bowsher v. Synar*, 478 U.S. 714, 727 n.5 (1986)).

Such "here-and-now subservience" is flatly at odds with the PBA's express provisions precluding any "direction, supervision, or control . . . over the Corporation," 47 U.S.C. § 398(a). To allow the President to remove a CPB Board member at will—including for mere policy disagreement or due to political affiliation—would permit the Government to exercise the very direction, supervision, or control that Congress denied it. The removal provisions in the D.C. Code that are incorporated by the PBA's cross-reference to the D.C. Nonprofit Corporation Act therefore cannot be applied to permit at-will removal by the President because those provisions apply only "to the extent consistent with" the PBA, including its express preclusion of the exercise of direction, supervision, or control by the Government. *Id.* § 396(b). In particular, the Government's

reliance on D.C. Code § 29-406.08(e), which provides that "[e]xcept as otherwise provided . . . , a director who is appointed by persons other than the members may be removed with or without cause by those persons," is unavailing. To the extent the D.C. Code permits the President to remove CPB's Board members without reason or cause, it cannot be applied consistent with the PBA.

For the same reason, the Court should reject the Government's argument that a removal power should be implied from the President's appointment power in the PBA. Although it is true that the "power of removal" is typically "incident to the power of appointment," *In re Hennen*, 38 U.S. 230, 259 (1839), that presumption does not hold where there is express statutory language to the contrary. *See Carlucci v. Doe*, 488 U.S. 93, 95 (1988) ("[A]bsent a 'specific provision to the contrary, the power of removal from office is incident to the power of appointment.'" (quoting *Keim v. United States*, 177 U.S. 290, 293 (1900))); *Severino v. Biden*, 71 F.4th 1038, 1044 (D.C. Cir. 2023). Additionally, the Supreme Court has never applied that presumption to an entity that is outside the branch of government in which the appointing authority is located. *Cf. Kennedy*, 145 S. Ct. at 2444 (applying presumption to conclude that the Secretary of Health and Human Services may remove members of a task force located within that department); *In re Hennen*, 38 U.S. at 258-62 (applying presumption to conclude that district judge may remove clerk of court). The Government cites no case to support applying the presumption in that context.

Whatever force the presumption may have with respect to the President's appointment of executive officers within executive agencies, it has none here given Congress's deliberate establishment of CPB as "not . . . an agency or establishment of the United States Government," 47 U.S.C. § 396(b), whose Board members are "not . . . officers or employees of the United States," *id.* § 396(d)(2), and which is shielded from government "direction, supervision, or control," *id.* § 398(b). Because the PBA's non-interference provisions create a "statutory structure"

that is "operationally incompatible with at-will Presidential removal," no implied power of removal can be read into the statute. *Severino*, 71 F.4th at 1047.

The Government also argues that the PBA's preclusion of government "direction, supervision, or control" of the CPB does not apply because the President is not an "officer, or employee of the United States" and is therefore outside the scope of the provision. Gov't SJ Mem. at 27-28. But Congress expressed its clear intent to broadly insulate CPB from any "extraneous interference and control." 47 U.S.C. § 396(a)(10). Terms defining the scope of the PBA's preclusion of government "direction, supervision, or control" therefore should not be given technical or crabbed meanings that would conflict with that purpose; to read the PBA's noninterference provision to exclude the President would do just that.

Regardless, there is ample authority for reading "officer or employee" in federal statutes to encompass the President. *See, e.g.*, *Nat'l Wildlife Fed'n v. United States*, 626 F.2d 917, 923 (D.C. Cir. 1980) (holding that the statutory reference to "officer or employee" in mandamus statute encompassed the President); *Carroll v. Trump*, 49 F.4th 759, 763, 770 (2d Cir. 2022) (holding that the President "fits comfortably" within the statutory reference to "officers" or "employees" of the United States under the Westfall Act); *Operation Rescue Nat'l v. United States*, 147 F.3d 68, 71 (1st Cir. 1998) (stating that the FTCA covers "all officers, up to the president"). The Government's citation of *Franklin v. Massachusetts*, 505 U.S. 788 (1992), is not to the contrary, as the Court there was considering different language ("agency" rather than "officer or employee") in the context of a different statute (the Administrative Procedure Act rather than the PBA). *Id*. at 796.

The PBA therefore must be applied to preclude the President from directing, supervising, or controlling the CPB through the at-will removal (or threat of removal) of its Board members. If the President were to be permitted to terminate CPB Board members based on mere policy

disagreement or political affiliation—or for no reason at all—that would give him the plenary supervisory and directive authority over CPB that Congress expressly denied him in the PBA.[3]

### B.    The PBA's Limitations on the President's Removal Power Are Constitutional

To the extent the Government contends that the PBA's preclusion of at-will removal unconstitutionally constrains the President's Article II power, that argument lacks merit. Whatever removal authority the President possesses over the executive officers who exercise executive authority on the President's behalf, that authority does not extend to presidential appointees who do not wield executive power and whom Congress has expressly shielded from government control. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 597, 637-38 (1952) (Jackson, J., concurring) ("When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb . . . ."). Rather, the President's Article II removal power is limited to executive branch officers who are accountable to the President. *See Seila Law*, 591 U.S. at 213-14 ("These lesser officers must remain accountable to the President, whose authority they wield.").

As noted above, under the express language of the PBA, CPB is not an executive agency, and CPB Board members are not officers or employees of the United States. Instead, CPB is a private nonprofit corporation that Congress took extensive measures to insulate from government control. *See* SOMF ¶¶ 27-41. In none of the Supreme Court's decisions considering the constitutionality of express or implied restrictions on the President's removal authority, from *Myers v. United States* through the recent stay decision in *Trump v. Wilcox*, has the Court ever

---

[3] Although this Court in *CPB v. Trump* expressed reservations about a situation in which the CPB's Board members could not be removed for cause, even in the most egregious cases, this case does not implicate that question because Ms. Kaplan was removed without any reason.

suggested that the President's Article II power must extend to the at-will removal of officials like CPB's Board members who are statutorily defined to be non-executive officers of a private corporation outside the executive branch. Instead, the Court has consistently characterized the President's removal power as extending only to executive officers. *See Myers v. United States*, 272 U.S. 52, 126 (1926) ("[T]he power of appointment to executive office carries with it, as a necessary incident, the power of removal."); *Humphrey's Ex'r v. United States*, 295 U.S. 602, 627-28 (1935) (characterizing *Myers* as supported by "the theory that [an executive officer] is merely one of the units in the executive department and, hence, inherently subject to the exclusive and illimitable power of removal by the Chief Executive, whose subordinate and aid he is"); *Free Enter. Fund*, 561 U.S. at 501 ("The President has been given the power to oversee executive officers [through removal]."); *Seila Law*, 591 U.S. at 213-214 ("Th[e executive] power, in turn, generally includes the ability to remove executive officials . . . ."); *Collins*, 594 U.S. at 250 ("[W]e generally presume that the President holds the power to remove at will executive officers . . . ."); *Wilcox*, 145 S. Ct. at 1415 ("Because the Constitution vests the executive power in the President . . . , he may remove without cause executive officers who exercise that power on his behalf . . . ."); *see also U.S. Inst. of Peace v. Jackson*, 783 F. Supp. 3d 316, 340 (D.D.C. 2025) ("Even under the broadest vision of the unitary executive theory . . . presidential removal authority only extends as far as officials in that branch."), *decision stayed pending appeal on other grounds*, No. 25-5185, 2025 WL 1840572 (D.C. Cir. June 27, 2025).

The Supreme Court's decisions in *Lebron v. National Railroad Passenger Corporation*, 513 U.S. 374 (1995), and *Department of Transportation v. Association of American Railroads*, 575 U.S. 43 (2015), do not support extending presidential removal power to CPB. First, in both cases, the Supreme Court considered the status of Amtrak for purposes of constitutional claims

brought by individual persons or entities. *See Lebron*, 513 U.S. at 392-94 ("[I]t is not for Congress to make the final determination of Amtrak's status as a Government entity for purposes of determining the constitutional rights of citizens affected by its actions."); *id.* at 394 (concluding that Amtrak "is an agency or instrumentality of the United States for the purpose of individual rights guaranteed against the Government by the Constitution"); *Dep't of Transp.*, 575 U.S. at 55 (noting, in a suit raising constitutional claims by a private trade association, that "[t]he structural principles secured by the separation of powers protect the individual as well"). The concern in each instance was ensuring that the "Constitution constrains governmental action 'by whatever instruments or in whatever modes that action may be taken.'" *Lebron*, 513 U.S. at 392 (quoting *Ex parte Virginia*, 100 U.S. 339, 346-47 (1880)). That inquiry and concern is entirely distinct from whether the Article II power requires that the President be permitted to remove at will Board members of an entity that Congress has expressly deemed not to be governmental and expressly insulated from government control. As the D.C. Circuit has recognized, the Court's decision in *Lebron* was limited to the legal inquiry in that case. *See U.S. ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 492 (D.C. Cir. 2004) (Roberts, J.) (declining to extend *Lebron*'s conclusion about Amtrak to the False Claims Act context).

Applying the *Lebron* framework here would also conflict with the principle that courts seek to avoid, rather than create, constitutional problems. *See Kennedy*, 145 S. Ct. at 2451 (noting, in an Appointments Clause case, that the Court "should not read the statute in a way that makes [it] unconstitutional if we can reasonably read it otherwise"). Under a straightforward reading of the PBA, the President lacks the authority to supervise or control, and therefore to remove at will the Board members of CPB, a nongovernmental corporation. The Government would have this Court conclude that, contrary to the express language of the PBA, CPB should be treated as part of the

government for these purposes, and that the PBA's insulation of the CPB Board members from the threat of at-will removal, through its preclusion of government supervision or control, violates the Constitution. Such a view thus creates a constitutional problem where none need exist.

Were this Court to apply the *Lebron* framework to CPB, it would not support a different outcome. Although it is true that there are certain similarities between Amtrak and CPB, "*Lebron* teaches that, for purposes of Amtrak's status as a federal actor or instrumentality under the Constitution, the practical reality of federal control and supervision" governs. *Dep't of Transp.*, 513 U.S. at 55. That "practical reality of federal control and supervision" is wholly absent in the context of the PBA and CPB. Unlike Amtrak, CPB is not owned by the Government, and its Board does not—and cannot—consist of officers or employees of the United States. 47 U.S.C. § 396(d)(2). More importantly—and in contrast to Amtrak's authorizing statute—the PBA precludes the government from exercising any "direction, supervision, or control" over CPB. *Id.* § 398(a); *see id.* § 396(a)(10) ("[A] private corporation should be created . . . to afford maximum protection from extraneous interference and control."). And CPB's core statutory function—to "make grants" in service of its telecommunications mission, *id.* §§ 396(g)(2)(B)-(C)—is not a uniquely governmental function. Indeed, countless private nonprofit organizations do just that. In short, *Lebron* and *Department of Transportation* do not provide a reason for concluding, contrary to the clear text of the PBA, that CPB is part of the executive branch for purposes of construing the President's authority to remove its Board members.

## IV.    Even if the Court Determines That Ms. Kaplan Was Removed, She Is Lawfully Serving as a Member of a Designated Body

Even if the Court were to determine that President Trump removed Ms. Kaplan from the CPB Board, she would be authorized to perform her duties as a member of the contingent designated body and thus would not be usurping a public office.

The PBA, D.C. Code, and CPB's By-laws authorize CPB to create a designated body to perform certain functions of the Board in the event it falls below the statutorily required number of members. As this Court previously recognized, "the District of Columbia Nonprofit Corporation Act and the Corporation's bylaws provide the Corporation with another tool to protect its independence and ability to continue to operate, even if the President removes multiple directors." PI Order at 17, *CPB v. Trump*, ECF No. 32; *see also* May 14, 2025 Tr. at 7 ("[W]hy not then take advantage of the designated body provision?"); *id.* at 8 ("[A]t least until the case is resolved, why not just designate individuals pursuant to the designated body provision of the DC law and the bylaws?"); *id.* ("[T]he DC Nonprofit Corporation Act and your bylaws contemplate that . . . there is a mechanism that allows [CPB] to continue to operate through a designated body."). And as the Court further noted, CPB through its By-laws had already "adopted this provision [regarding the designated body]." PI Order at 17, *CPB v. Trump*, ECF No. 32.

D.C. Code § 29-406.12(a), which authorizes the establishment of a designated body to perform the functions of a nonprofit board, applies to CPB through the PBA's cross-reference to the D.C. Nonprofit Corporation Act. 47 U.S.C. § 396(b). That provision authorizes "[s]ome, but less than all, of the powers, authority, or functions of the board of directors of a nonprofit corporation" to be "vested by the articles of incorporation or bylaws in a designated body." D.C. Code § 29-406.12(a). When a designated body is constituted, "[t]he rights, duties, and liabilities of the board of directors . . . shall also apply to the designated body," and "the directors shall be relieved from their duties and liabilities with respect to" any "powers, authority, or functions of the board of directors [that] have been vested in the designated body." *Id.*; *see also id.* § 29-401.02(8) (defining a "designated body" as "a person or group . . . that has been vested . . . with powers that . . . would [otherwise] be required by [statute] to be exercised by the board"). As this

Court correctly noted, the CPB By-laws provide for the appointment of a designated body when the Board is lacking "the statutory minimum number of presidentially appointed Directors" to "exercise the rights and responsibilities of the Board until such time as there are three (3) presidentially appointed Directors." SOMF ¶ 59. The By-laws further state that "[m]embers of the Designated Body shall include the remaining presidentially appointed Directors plus the number of former Directors, appointed as provided in Section 5.03, as are required for a total of three (3) members." *Id*.

In accordance with the CPB By-laws, CPB's President and CEO on June 8, 2025 issued a Determination appointing a contingent designated body that includes Ms. Kaplan, which states, in relevant part,

> NOW, THEREFORE, pursuant to Section 5.03 of the CPB Bylaws, I have the authority to appoint a Designated Body to act as a Board when the number of directors purports to fall below the statutorily required number. While it is CPB's position that its Board of Directors' membership has remained unchanged notwithstanding the purported actions of the President, I hereby invoke my authority under Article V of the Bylaws to appoint a contingent Designated Body to avoid any later challenge in the event CPB's position is not sustained. I further affirm and state that Tom Rothman, Diane Kaplan, and Laura Ross are, have been, and will continue to be members of the Board of Directors of the Corporation for Public Broadcasting.

> Under the Bylaws, "Such former Directors shall be selected in the order in which they most recently served as Directors." Given that each of the directors purported to be removed was given that communication simultaneously, I cannot determine which director should be given priority. Accordingly, I hereby appoint Tom Rothman, Diane Kaplan, and Laura Ross to the Designated Body to join Ruby Calvert and Liz Sembler whose Board membership is not at issue.

SOMF ¶ 72.

If this Court were to conclude that Ms. Kaplan was lawfully removed from her position as a CPB Board member, she would be serving on the designated body appointed by CPB's President and CEO. Under the Determination and the CPB By-laws, she would possess all the authorities of a Board member except for the authority to remove other members. *See id.* ¶ 76. Specifically, she

would have the necessary authority to, among other things, participate in meetings, make statements at those meetings, vote on matters coming before the body, and sign resolutions, including with respect to amendments of the CPB By-laws. *See id.* ¶ 77. Thus, even if the position of CPB Board member is a "public office" under the quo warranto statute (and it is not, for the reasons explained in Argument Section II), Ms. Kaplan would not be usurping her authority by continuing to exercise the rights and responsibilities of the Board member role. *See id.* ¶ 56.

The Government suggests that Ms. Kaplan's appointment to the designated body may not comply with the PBA, apparently because her service on that body would somehow conflict with the President's purported removal decision. Gov't SJ Mem. at 43 n.10. It is unclear precisely how, in the Government's view, the President's decision to remove a CPB Board member could affect the validity of the designated body or Ms. Kaplan's service on it. A designated body is a mechanism separate from Board appointment that is designed for the very purpose of ensuring the continued performance of Board functions in the event of a vacancy that places the Board below its statutorily required number of members, however that vacancy may arise. *See* SOMF ¶ 59 (CPB By-laws authorizing designated body "in the instance that the Corporation's Board fails to meet the statutory minimum number of directors required under the D.C. Nonprofit Corporation Act" without limitation as to the circumstances giving rise to the absence of the statutory minimum number of directors). Moreover, as discussed above, there is nothing in the PBA that authorizes at-will removal of a CPB Board member, and indeed, the recognition of such a power, whether implied in the PBA or through the PBA's cross-reference to the D.C. Nonprofit Corporation Act, would itself conflict with the PBA's preclusion of government supervision, direction, or control over the Board. *See* Argument Section III.A.

In addition, contrary to the Government's further suggestion, the Determination is valid even though it names more than three potential members to the contingent designated body. *See* Gov't SJ Mem. at 22 n.5. The Government's argument fails for two reasons. First, it is undisputed that Ms. Kaplan is the only one of the three former directors who continues to serve in her role with CPB. *See* SOMF ¶¶ 15, 20. Thus, if there was an excess of potential members, it no longer exists. Second, as the Government recognizes, the designated body is contingent, *see* Gov't SJ Mem. at 42-43, and the question is therefore whether a valid designated body was serving at the time of the relevant acts—not how many potential members were included in the Determination.

The Determination is thus fully consistent with CPB By-laws and the D.C. Code. *See* SOMF ¶ 75. Further, as a business decision made by an officer of a D.C. corporation, the Determination is presumptively valid under the business judgment rule. *See Behradrezaee v. Dashtara*, 910 A.2d 349, 361 (D.C. 2006) (adopting the business judgment rule and explaining that a business decision must "be respected by the courts" "[a]bsent an abuse of discretion" (citation omitted)); *Pub. Inv. Ltd. v. Bandeirante Corp.*, 740 F.2d 1222, 1232 (D.C. Cir. 1984) (recognizing that the business judgment rule affords deference to "officers and directors").

## CONCLUSION

For the reasons explained above, the Court should deny the Government's motion for summary judgment and grant Defendant Diane Kaplan's cross-motion for summary judgment.

Dated: September 29, 2025

Respectfully submitted,

/s/ Trisha Anderson

Trisha Anderson (D.C. Bar 497224)
Kaitlin Konkel (D.C. Bar 1021109)
Helia Bidad (*pro hac vice*)
HECKER FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
Telephone: (212) 763-0883
tanderson@heckerfink.com
kkonkel@heckerfink.com
hbidad@heckerfink.com

*Counsel for Defendant Diane Kaplan*